**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA), and have been since July 8, 2018. As a SA with the DEA, I completed the 16-week DEA Basic Agent Training ("BAT") course in Quantico, Virginia. As part of the BAT course, I received training in narcotic investigations, narcotic interdiction, identification of narcotics, search and seizure issues, surveillance techniques, preparation and execution of narcotic search warrants, debriefing of defendants, witnesses, and cooperating sources. As of December 23, 2018, I have been assigned to the DEA-Youngstown Resident Office (DEA-YRO), Task Force Group #D-48. Prior to my employment with the DEA, I was employed as a Police Officer by the City of Portage, Indiana for approximately six and a half years and graduated from the Northwest Indiana Law Enforcement Academy (NILEA) in Hobart, Indiana.

2. I have been involved in numerous narcotics-related arrests, have executed search warrants that resulted in the seizure of narcotics or dangerous drugs, and have supervised the activities of numerous informants and cooperating witnesses who have provided information and assistance resulting in drug buys, searches, and arrests. Based on the above experience, I am familiar with the *modus operandi* of persons involved in the illicit distribution of controlled substances, as well as the terminology used by persons involved in the illicit distribution of controlled substances. I am aware that persons involved in the illicit distribution of controlled substances nearly always attempt to conceal their identities and the locations where drugs are sold and stored, which are

1

frequently at locations different from where they reside.  I am also aware that persons involved in the illicit distribution of controlled substances utilize cellular phones to communicate with one another.  I am also aware that drug traffickers use vehicles to transport drugs to and from locations where drugs are stored.  I also am aware that drug traffickers, when preparing vehicles for travel and transport and during the actual travel and transport, frequently use counter-surveillance tactics to avoid detection and apprehension by law enforcement, including storing their vehicles in locations where they can be privately accessed while remaining hidden from observing law enforcement.  It is likewise essential that such organized groups meet to formulate plans concerning narcotics or other illegal activities, and to divide their illegal proceeds.

3. On a regular basis, I review law enforcement bulletins and intelligence reports regarding narcotic trafficking and smuggling, and remain in communication with counterparts in order to remain up to date with modern techniques and trends used by narcotic traffickers in the domestic and international arena.

4. Based upon my training, experience and discussions with other Special Agents and law enforcement officers concerning the distribution of controlled substances, I know:

a)   That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

b)   That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

c)   That drug traffickers often place drugs and assets in hidden locations,

2

known as "safe houses," to protect and conceal the location from government agencies, thereby avoiding conducting transactions at these places, but often times in very close proximity to these locations.

d)  That drug traffickers frequently use automobiles to transport or hide drugs and drug proceeds.

e)  That when drug traffickers amass large proceeds from the sale of drugs they attempt to legitimize these profits.  To accomplish these goals, drug traffickers utilize domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.  Drug traffickers using the banking system or money instruments frequently store bank statements, receipts, letters, and other financial documents in their house.  In addition, drug traffickers frequently use third parties to conduct financial transactions to launder their illegal proceeds and hide assets from law enforcement.

f)  That drug traffickers and those who launder drug proceeds commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their associates.

g)  That unexplained wealth is probative evidence of crimes motivated by greed, in particular, money laundering and trafficking in controlled substances.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

      6.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, U.S.C. Section 841(a)(1), that is, knowingly and intentionally distributing and possessing with the intent to distribute marijuana has been committed by **KEITH JOHN ANDERSON**.

      7.  The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## RELIABILITY OF INFORMATION

      8. Except as otherwise noted, the information set forth in this Affidavit has been provided to me by officers and agents of the DEA-YRO or other law enforcement officers or agents.  Unless otherwise noted, whenever in this Affidavit, I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Likewise, information resulting from physical surveillance, except where otherwise indicated, does not necessarily set forth my observations, but rather has been provided directly or indirectly through the DEA or other law enforcement officers who conducted such surveillance.  Any information pertaining to vehicles and/or registrations, personal data on subjects or record checks has been obtained through the Law Enforcement Automated Data System ("LEADS") from the State of Ohio, the Ohio Law Enforcement Gateway ("OHLEG") from the Ohio Attorney

4

General's Office or the National Crime Information Center ("NCIC") computers by
members herein described.

## **PROBABLE CAUSE**

9.  On February 26, 2020, members of the DEA-YRO were notified by Ohio
State Highway Patrol that a traffic stop on a Recreational Vehicle (RV) led to the seizure
of a large amount of suspected marijuana and bulk United States currency.  The RV as
well as the driver, **KEITH JOHN ANDERSON**, and passenger, Jarral Perkins, were
now at Maintenance Building 6, located on Interstate-80 near mile marker 174 in Summit
County, Ohio.

10.  Trooper Boyer with the Ohio State Highway Patrol conducted a traffic
stop of the RV for a traffic violation in the Northern District of Ohio, Eastern Division,
and approached the vehicle and spoke with **KEITH JOHN ANDERSON**.  Trooper
Boyer stated **KEITH JOHN ANDERSON** told him that the RV belonged to Mary
Landa and that she was paying him to test drive the RV around the United States.
**KEITH JOHN ANDERSON** stated that he was traveling to Baltimore, Maryland and
then was going to travel to Connecticut.

11.  Trooper Boyer stated while he was speaking with **KEITH JOHN
ANDERSON**, he could smell the odor of raw marijuana emitting from the
vehicle.  Trooper Boyer then conducted a search of the vehicle and located a passenger,
Jarral Perkins, lying in the bed of the RV, apparently sleeping.  Trooper Boyer stated that
Jarral Perkins had four (4) cell phones, numerous rubber bands, and loose papers of what
Trooper Boyer recognized as apparent drug ledgers lying around him on the bed.  In the
cabinet, Trooper Boyer located a large duffel bag that further contained numerous

vacuum sealed bags of suspected marijuana. Behind the duffel bag, Trooper Boyer located a brown grocery style bag filled with a bulk amount of loose United States currency and two FedEx boxes that each contained bulk amounts of United States currency. In the bathroom of the RV, Trooper Boyer located eight (8) additional large duffel bags, each further containing numerous vacuum sealed bags of suspected marijuana.

12. The nine (9) large duffel bags containing the suspected marijuana were maintained as evidence by the Ohio State Highway Patrol. The nine (9) large duffel bags contained a total of approximately two-hundred and thirty-six (236) vacuum sealed bags of suspected marijuana. Each vacuum sealed bag appeared to contain approximately one (1) pound of suspected marijuana. The vacuum sealed bags also had the word "sour" written on the outside of the bag. I know from my training and work experience that there are different strains of marijuana, and drug traffickers typically label what strain or "flavor" the marijuana is. The bulk amounts of United States currency as well as the RV were seized by the DEA-YRO.

13. Investigators then conducted an interview with Jarral Perkins. Investigators first gathered Jarral Perkins' name, date of birth, and social security number. Investigators then asked for Jarral Perkins' address, which he provided as XXXXX West Charleston, Las Vegas, Nevada 89135. At approximately 1:25 p.m., Jarral Perkins was read his Miranda Rights from a DEA-13a (Miranda Warnings card) by SA Richard Schmitt. SA Schmitt also had Jarral Perkins read along on a DEA-13 (Miranda Rights form). Jarral Perkins signed the DEA-13 form and advised he understood his rights.

14. Investigators asked Jarral Perkins how he knew **KEITH JOHN ANDERSON,** and Jarral Perkins replied that he knew **KEITH JOHN ANDERSON** from business.  Investigators asked Jarral Perkins what type of business he was involved in with **KEITH JOHN ANDERSON** and Jarral Perkins stated they were involved in residential real estate together.

15. Investigators then asked Jarral Perkins what led him to being in the RV when it was stopped by Trooper Boyer.  Jarral Perkins stated that he flew into Cleveland, Ohio on February 25, 2020, and was just traveling with **KEITH JOHN ANDERSON** to the "next spot".  Perkins stated he had stayed in Cleveland February 25, 2020 and spoke with **ANDERSON** on the phone. Investigators then asked why he met with **KEITH JOHN ANDERSON** and Jarral Perkins stated he (Jarral Perkins) was going to be headed to Columbus, Ohio and **KEITH JOHN ANDERSON** told him that he (**KEITH JOHN ANDERSON**) was headed that way as well.  Jarral Perkins then stated, "I literally just saw Keith (**KEITH JOHN ANDERSON**) thirty (30) minutes prior to this".  Investigators asked if he meant thirty (30) minutes prior to the traffic stop and he stated that was correct.  Jarral Perkins stated he had returned his rental car to the Dollar Rental Car desk at the Cleveland Airport, and then **KEITH JOHN ANDERSON** picked him up at the airport in the RV.  Investigators then asked Jarral Perkins if he knew who owned the RV and he stated he did not.  Investigators informed Jarral Perkins that a large amount of narcotics and money was found inside the RV. Jarral Perkins stated he didn't know that narcotics and money was in the vehicle and stated he didn't smell marijuana or anything else.

7

16. Investigators then asked Jarral Perkins if he knew why **KEITH JOHN ANDERSON** was heading to Columbus, Ohio and Jarral Perkins stated he didn't think **KEITH JOHN ANDERSON** was going directly to Columbus, Ohio. Jarral Perkins stated he was just heading in that direction. The interview with Jarral Perkins concluded at approximately 1:42 p.m.

17. At approximately 2:03 p.m., investigators conducted an interview with **KEITH JOHN ANDERSON**. It should be noted that SA Schmitt notified **KEITH JOHN ANDERSON** that the interview was going to be recorded, which **KEITH JOHN ANDERSON** stated he understood. SA Schmitt read **KEITH JOHN ANDERSON** his Miranda Rights from a DEA-13a (Miranda Warnings card) and also had **KEITH JOHN ANDERSON** read along on a DEA-13 (Miranda Rights form). **KEITH JOHN ANDERSON** signed the DEA-13 and advised he understood his rights. **KEITH JOHN ANDERSON** stated he wanted to have an attorney present before answering any questions. The interview was concluded at approximately 2:05 p.m.

## CONCLUSION

18. Based on the foregoing information, there is probable cause to believe that **KEITH JOHN ANDERSON** commit Possession with Intent to Distribute Marijuana, in

violation of 21 U.S.C. 841 (a) (1), and such offense(s) occurred within the Northern

District of Ohio.

Respectfully submitted,

Richard T. Schmitt
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this 27 day of February, 2020.

GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE